IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KATHY W.,                           )
                                    )
                Plaintiff,          )
                                    )
        v.                          )      1:24CV642
                                    )
FRANK BISIGNANO,                    )
Commissioner of Social Security,[1] )
                                    )
                Defendant.          )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kathy W. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on January 11, 2023, alleging a disability onset date of December 7, 2022 in both applications. (Tr. at 11, 267-75.)[2] Her applications were denied initially (Tr. at 89-106, 123-32) and upon reconsideration (Tr. at 107-

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted for Leland Dudek as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #7].

22, 140-47).  Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ").  (Tr. at. 171-72.)  On December 11, 2023, Plaintiff, along with her attorney, attended the subsequent telephonic hearing, at which both Plaintiff and an impartial vocational expert testified.  (Tr. at 11, 44-88.)  Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 24), and on June 5, 2024, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (citation and internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted).  "If there is

2

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since December 7, 2022, her alleged disability onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 13.) At step two, the ALJ further determined that Plaintiff had the following severe impairments:

> diffuse large B-cell non-Hodgkin's lymphoma, unspecified body region; peripheral neuropathy residual of chemotherapy; deep vein thrombosis (DVT); and syncope episodes or seizures[.]

(Tr. at 13.) The ALJ found at step three that none of these impairments, singly or in combination, met or equaled a disability listing. (Tr. at 16.) The ALJ therefore assessed Plaintiff's RFC and determined that she could perform a work at the medium exertional level, but with the following, non-exertional limitations:

5

> [Plaintiff] can occasionally climb ladders/ropes/scaffolds; frequently but not constantly handle, finger, and feel; and she must avoid concentrated or frequent exposure to hazards of unprotected heights, moving machinery, or large open bodies of water.

(Tr. at 16-17.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff's past relevant work as a personnel recruiter and residential leasing agent did "not require the performance of work-related activities precluded by" the above RFC. (Tr. at 22.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 24.)

Plaintiff now argues that, in assessing her RFC, the ALJ "failed to include significant limitations resulting from [Plaintiff's] impairments and failed to provide an adequate discussion rejecting those limitations." (Pl.'s Br. [Doc. #10] at 1.) Specifically, Plaintiff contends that the ALJ failed to properly consider the impacts of Plaintiff's neuropathy and fatigue when formulating her RFC. (Pl.'s Br. at 7.)

As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. <u>Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u>, SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("SSR 96-8p"). "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." <u>Monroe v. Colvin</u>, 826 F.3d 176, 179 (4th Cir. 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-

6

8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted). Remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" despite conflicting evidence regarding the claimant's RFC that the ALJ did not address. Id. at 637.

Here, Plaintiff challenges the ALJ's analysis of evidence relating to Plaintiff's fatigue and neuropathy and, more generally, Plaintiff's ability to perform medium exertional level work with frequent handling and fingering, in light of her peripheral neuropathy as a result of chemotherapy. (Pl.'s Br. at 7-9.) Plaintiff further argues that the ALJ's alleged errors "cannot be considered harmless":

> [T]he [vocational expert] testified that . . . a reduction to occasional handling and fingering, limitations that would logically flow from [Plaintiff's] severe neuropathy, with her other limitations[,] would be work preclusive. [(Tr. at 85.)] Here, the ALJ did not build a logical bridge from the evidence to her finding that [Plaintiff] could perform medium level work which requires lifting 25 lbs. frequently and 50 lbs. occasionally, walking on and off for a total of 6 hours in and 8-hour workday. See SSR 83-10. The record supports that [Plaintiff's] impairments preclude the ability to perform medium work on a regular and sustained basis. The ALJ's decision is not supported by substantial evidence and[,] therefore, remand is required.

(Pl.'s Br. at 9-10.)

As recounted in the administrative decision, Plaintiff testified during her hearing that

> she is unable to work due to fatigue, neuropathy in her feet and fingertips stemming from chemotherapy treatment, seizures, and pain in her extremities. She described undergoing treatment, including chemotherapy and radiation, for lymphoma. She noted that she completed treatment in October [2023]. She explained that during treatment she felt weak, nauseous, and lost weight. She testified that she continues to experience memory issues, bone pain, and neuropathic tingling and pain. She indicated that she has difficulty standing and walking for extended periods. She noted that she has a walker and can walk for short periods without it. She stated that she takes pain medication prescribed by palliative care providers. She reported that during the period in question she has not driv[en,] either because her neurologist instructed her not to or because she has not had a vehicle. She explained that she live[d] with her adult son and during the day she trie[d] to do small household chores but must stop frequently to take breaks. She noted that her son helps her with laundry, grocery shopping, and cooking.

(Tr. at 17.) The ALJ acknowledged that Plaintiff experienced limitations in her ability to perform basic work activities due to her impairments, including peripheral neuropathy and lymphoma, which were included among Plaintiff's severe impairments at step two of the sequential analysis. (Tr. at 13, 17.) However, the ALJ ultimately found that [Plaintiff's] "statements about the intensity, persistence, and limiting effects of her symptoms" were unsupported "because her treatment notes do not reflect the degree of signs, symptoms, and dysfunction that would be expected were [Plaintiff] as limited as alleged." (Tr. at 18.) Plaintiff challenges this finding and Plaintiff's analysis of her symptoms.

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." <u>Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR

8

16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Commissioner of Social Security, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95-96; see also Hines, 453 F.3d at 564-65 (explaining that, "[b]ecause pain is not readily susceptible of objective proof . . . the absence of objective medical evidence of the intensity, severity, degree[,] or functional effect of pain is not determinative" (emphasis omitted)). The Fourth Circuit later affirmed and expanded its previous holdings when issuing Shelley C. v. Commissioner of Social Security Administration, 61 F.4th 341, 361-62 (4th Cir. 2023). In Shelley C., the Court explained that some conditions do not manifest themselves in objective signs and symptoms. "[B]ecause of the unique and subjective nature of [such impairments], subjective statements from claimants [in these cases] 'should be treated as evidence substantiating the claimant's impairment.'" Id. (quoting Arakas, 983 F.3d at 97-98).

9

The ALJ's error in this case is most apparent in her analysis of Plaintiff's peripheral neuropathy and its effects. The ALJ noted that Plaintiff's medical records reflect peripheral neuropathy due to chemotherapy beginning in May and June 2023. (Tr. at 18, 1053, 1081, 1541-42.) The ALJ then analyzed the evidence regarding Plaintiff's peripheral neuropathy as follows:

> The claimant reported to Dr. Parikh that she was experiencing numbness and tingling of her hands and feet that made it difficult to use her hands or walk. However, electromyography (EMG) and nerve conduction study (NCS) results were normal. Dr. Parikh's clinic notes do not include physical exam findings related to these complaints to conclude as she does in a medical source statement, detailed below, that the claimant has a functional loss of fine or gross motor skills due to neuropathy from chemotherapy. Dr. Parikh noted in an email with the claimant on June 20, 2023, that the claimant likely ha[s] small fiber neuropathy, there is no evidence of neuropathy on EMG or NCS testing or physical exam results to support this conclusion (Exhibits 10F; 11F). Additionally, at a September 9, 2023, clinic visit the claimant reported that she had no serious difficulty walking or climbing stairs (Exhibit 21F p. 28). The medical evidence of record does not indicate that the claimant ever underwent a biopsy to confirm a diagnosis of small fiber neuropathy and Dr. Parikh seems to be basing her conclusion on the claimant's subjective reports. However, a diagnosis of peripheral neuropathy due to chemotherapy was properly diagnosed through physical exam findings by primary care providers of decreased sensation to light touch of her hands and feet and this is adequately addressed by the residual functional limitation of frequent but not constant handling, finger, or feeling as well as occasional climbing of ladders/ropes/scaffolds and the avoidance of concentrated or frequent exposure to hazards of unprotected heights, moving machinery, or large open bodies of water.

(Tr. at 19-20.) Dr. Parikh is Plaintiff's neurologist at Duke Hospital and is a professor at Duke University Medical Center. In her statement, Dr. Parikh explained that:

> I am a board-certified neurologist and epileptologist. Kathy Woodard has been my patient since 7/3/23 at Duke University Department of Neurology.
>
> I treat Kathy primarily for her epilepsy which was a result of her tumor primarily. However, during my evaluation for Kathy I have also noted that she has clinical signs and symptoms of painful small fiber neuropathy. This is likely

> a side effect of the chemotherapy that she is receiving. Kathy has b-cell lymphoma that is treated by my colleagues in oncology.
>
> Kathy experiences severe pain in her hands and in her feet. I have observed the redness and swelling in her fingers and feet which is accompanied by numbness. She is unable to drive as a result of this and her seizure. Painful small fiber neuropathy makes it hard for Kathy to be able to manipulate objects with her fingers - such as opening cans, typing, buttoning etc. She is unable to stand for long periods of time. Kathy finds it difficult to walk for long periods of time because of pain in her feet and she uses a walker to help her to get around.

(Tr. at 2121.) In evaluating this evidence, the ALJ again undertook a similar analysis, and found that:

> This medical source statement is not persuasive as it does not delineate any physical findings or treatment course other than a prescription for Lamotrigine that was never completely titrated to therapeutic levels prior to authorization ended on October 25, 2023, with 11 refills remaining. Additionally, Dr. Parikh only saw the claimant once prior to giving this interview. The evidence of record does not include therapeutic serum labs, or adjust of prescription use or dose. There is no foundation for the manipulative or exertional limitations offered other than the claimant's subjective complaints of pain. EMG/NCS results were normal and there are no deficits per various physical exam results by emergency room providers and other medical providers.

(Tr. at 27.) The ALJ thus discounts Plaintiff's pain and other symptoms from her peripheral neuropathy because (1) the "diagnosis of peripheral neuropathy due to chemotherapy . . . by primary care providers" is more supported than Dr. Parikh's diagnosis of "small fiber neuropathy," (2) EMG and NCS testing was normal; (3) Dr. Parikh only saw Plaintiff once prior to giving her opinion and her clinic notes do not support her conclusions, (4) Plaintiff did not take medication prescribed by Dr. Parikh, and other treatment records and emergency reports reflect "no deficits," and (5) Plaintiff's limitations and Dr. Parikh's opinion are based only on Plaintiff's subjective reports. (Tr. at 20-22). However, as to each of these lines of reasoning, the ALJ's analysis is not supported by the evidence in the record.

11

First, the ALJ concludes that the "diagnosis of peripheral neuropathy due to chemotherapy . . . by primary care providers" is more supported than Dr. Parikh's diagnosis of "small fiber neuropathy." (Tr. at 20.) However, nowhere in the ALJ's decision does she recognize that small fiber neuropathy is not a separate diagnosis, but rather a specific type of peripheral neuropathy.[5] Thus, Dr. Parikh's diagnosis of small fiber neuropathy is completely consistent with the more general diagnosis of peripheral neuropathy.[6]

Second, and relatedly, the ALJ relied repeatedly on the fact that Plaintiff's EMG and NCS tests were normal. Electromyography (EMG) and Nerve Conduction Studies (NCS) are tests to measure the electrical activity of muscles and nerves. While they are often used to detect and measure the severity of peripheral neuropathy, these tests can only pick up signals from *large* diameter nerve fibers. In contrast, signals from *small* diameter nerve fibers do not show up on EMG/NCS tests.[7] Dr. Parikh explained this to Plaintiff in texts explaining that Plaintiff likely has small fiber neuropathy, which "does not show up on an EMG," so it is

---

[5] See generally Neuropathy Overview, available at http://neuropathycommons.org/neuropathy/neuropathy-overview; Small Fiber Neuropathy, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC2771953/#:~:text=Large%20fiber%20neuropathy%20manifests%20with,pain%2C%20temperature%20and%20autonomic%20functions; Small fiber neuropathy, available at https://medlineplus.gov/genetics/condition/small-fiber-neuropathy/.

[6] As noted above, Dr. Parikh is Plaintiff's treating neurologist, is an attending physician at Duke Hospital, and is a Professor of Neurology at Duke University. The ALJ nevertheless dismissed Dr. Parikh's diagnosis, and relied on her own lay analysis of the medical records. See Arakas, 983 F.3d at 108 ("[T]he ALJ improperly substituted his own opinion for Dr. Harper's. An ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings.");

[7] Damage to these smaller sensory nerves may result in tingling, numbness, burning pain, or other sensory problems, mainly appearing in the feet and hands. See *infra* note 5.

12

"not unusual that the EMG is normal." (Tr. at 1268-69.) Thus, the normal EMG and NCS tests do not undermine or otherwise speak to Plaintiff's small fiber neuropathy.[8]

Third, the ALJ states that Dr. Parikh only saw Plaintiff once and that her examinations did not support her opinion. However, the record reflects that Dr. Parikh saw Plaintiff three times prior to giving her opinion letter: on July 3, 2023, August 24, 2023, and December 7, 2023. In addition, Dr. Parikh's clinic notes are not included in the record, so it is unclear how the ALJ found that Dr. Parikh's opinion was not supported by her exams, and it is unclear what records the ALJ referred to or why the record was not further developed before dismissing Dr. Parikh's opinion. Further, in her opinion letter, Dr. Parikh specifically noted that she had observed redness and swelling in Plaintiff's fingers and feet which was accompanied by numbness, thus reflecting examinations that supported her conclusions. (Tr. at 2121.) Plaintiff's treating oncologist, Dr. Kirby, likewise observed redness and peeling skin on Plaintiff's feet when she diagnosed peripheral neuropathy due to chemotherapy. (Tr. at 1081-82, 1276-84.)[9]

Fourth, the ALJ stated that Plaintiff did not take medication prescribed by Dr. Parikh, and that other providers noted "no deficits."[10] However, Dr. Parikh noted in her opinion

---

[8] Dr. Parikh also ordered an EEG after Plaintiff's visit in August 2025, and that EEG was "abnormal due to: Background slowing theta-delta range," further reflecting "Clinical correlation: Diffuse slowing present in the recording is consistent with a generalized brain dysfunction." (Tr. at 1835.)

[9] Dr. Kirby later submitted a letter, reviewed by the Appeals Council, noting that "[s]ide effects from chemotherapy, such as peripheral neuropathy in hands and feet, are debilitating side effects that can affect quality of life." (Tr. at 43.)

[10] The ALJ specifically noted no treatment by Dr. Parikh "other than a prescription for Lamotrigine that was never completely titrated to therapeutic levels prior to authorization ended on October 25, 2023, with 11 refills remaining." (Tr. at 22.) However, as to this reference, the records also reflect that Plaintiff completed the titration, and was still on Lamotrigine during her hospitalizations in July and September 2023, and while she

letter that Plaintiff's pain as a result of the small fiber neuropathy was addressed by her colleagues in the Palliative Care department. (Tr. at 2121.) With respect to the other treatment records, Plaintiff's pain, particularly in her extremities, remained her primary complaint throughout the majority of the time period at issue. For example, on June 30, 2023, Plaintiff presented to the emergency department with multiple symptoms, including "severe pain/bone pain, neuropathy of the finger tips and feet, swelling in fingers, [and] severe fatigue." (Tr. at 1386, 1387.) On July 26, 2023, she again reported "chronic painful neuropathy in the bilateral arms and legs" while in inpatient care for cancer treatment. (Tr. at 1443.) Five days later, during the same hospital stay,

> [P]laintiff [r]eport[ed] neuropathic pain since admission as well as generalized body pain which goes from "head to toe." She takes minimal medications at home for pain. She states that she occasionally will take a percocet at home. She requested IV morphine while admitted as this is the only time that she receives relief from her pain. [Plaintiff's providers c]onsulted palliative care to determine [a] feasible plan for outpatient [care] as her pain [was] uncontrolled when at home.

(Tr. at 1409.) During Plaintiff's initial consultation with palliative care, it was again noted that Plaintiff had

> neuropathic pain which [was] worst in her hands and arms. She sometimes has associated cramping [and] feels clumsy and prone to drop things. [She a]lso has numbness and neuropathic discomfort in [her] feet and legs but [her] upper extremities are worst. [Her p]ain [is] worse at night.

(Tr. at 1444.) Plaintiff's medication plan upon discharge included Gabapentin for neuropathic pain, 600 mg twice during the day and 1200 mg at night; Duloxetine 60 mg to further treat her chemotherapy-included peripheral neuropathy and depression; and 5-10 mg of liquid

---

did stop taking it for a time, it was re-started in October 2023. (See, e.g., Tr. at 1687-89, 1698-99, 1701-02, 1404-05, 1409-10, 1502, 1965, 1973, 1982-83, 1985-86, 2091, 2106.)

14

morphine as needed for pain. (Tr. at 1409, 1416, 1426, 1432, 1437, 1443.) During this treatment, it was noted that Plaintiff had been seen by neurology on July 3, 2023. Significantly, at no point did any provider question Plaintiff's reports of neuropathic pain, its intensity, or its effects on Plaintiff's functioning.[11] In addition, subsequent hospital records from August 2023 reflect uncontrolled neuropathic pain requiring intensive medication management, and hospital records from September 2023 likewise reflect intense pain management, with her neuropathic pain complicating her treatment and requiring extensive medication adjustments. (Tr. at 1687, 1689-90, 1697-98, 1773, 1964-65, 1972, 1978-79, 1987, 1990, 2000.)[12] These hospital records also reflect mobility issues, including walking assisted and use of a rolling walker in the hospital and a "4WW" walker at home. (Tr. at 1692, 1695, 1703-04, 1444.) These treatment records reflect that Plaintiff's ongoing pain was mostly related to her neuropathy. (Tr. at 1724.) Later treatment records from December 2023 reflect that she continued to suffer "crushing hand[] pain." (Tr. at 2117.) None of this information—or any other evidence related to Plaintiff's pain—was addressed in the ALJ's symptom analysis or elsewhere in her decision, other than to summarily dismiss it as "subjective."

Finally, to the extent the ALJ dismissed Dr. Parikh's opinion and Plaintiff's pain because it was subjective, that analysis is not consistent with the proper application of the 2-

---

[11] To the extent Defendant may argue that Plaintiff's pain was adequately addressed by medication and other treatment, the ALJ did not raise this justification in her decision. Moreover, the record from June 2023 forward strongly suggests that Plaintiff's pain was not well-controlled during this time, despite her increased medications. (See Tr. at 1451, 1454, 1720, 1724, 1978, 1986, 2000, 2003, 2011, 2117.)

[12] The ALJ also failed to address any potentially limiting side effects Plaintiff experienced from her extensive medications, which included opioids. Notably, Plaintiff's providers decreased her gabapentin in September 2023 in an effort to "improve her confusion and 'mental fog'" (Tr. at 1974) and discontinued her morphine due to digestive issues (Tr. at 1979).

15

step symptom analysis required by the regulations, as set out in <u>Arakas</u>. Specifically, at the first step of the subjective symptom analysis, the ALJ accepted Plaintiff's diagnosis of peripheral neuropathy due to chemotherapy as a condition that could reasonably be expected to produce her alleged symptoms. At this step, the ALJ relied on the consistent peripheral neuropathy diagnosis by all of Plaintiff's providers and Plaintiff's demonstrated decreased sensation in her hands and feet. (<u>See</u> Tr. at 20.) Having made this determination, the ALJ was then required, at the second step of the subjective statement analysis, to "consider the entire case record" when assessing the intensity and persistence of Plaintiff's symptoms. <u>Arakas</u>, 983 F.3d at 96. However, at no point did the ALJ even attempt to account for Plaintiff's pain allegations, which Plaintiff consistently cited as the main symptom of her peripheral neuropathy. Rather, it appears that the ALJ summarily discounted these symptoms, and the medical opinion evidence based upon them, simply because the complaints were "subjective." (Tr. at 20, 22.) In doing so, the ALJ improperly "disregard[ed] [Plaintiff's] statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate them." <u>Arakas</u>, 983 F.3d at 95 (citation omitted).

Because the ALJ's erred in both (1) considering the impact of Plaintiff's pain and other neuropathy symptoms on her ability to work and (2) connecting the neuropathy limitations set out in the RFC with the evidence as a whole, Plaintiff's claims require remand so that the ALJ may adequately address these issues in the first instance. To the extent that the ALJ also

16

failed to properly consider the effects of Plaintiff's fatigue on her RFC, this matter can also be addressed on remand as well.[13]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, that Defendant's Dispositive Brief [Doc. #11] be DENIED, that Plaintiff's Dispositive Brief [Doc. #10] be GRANTED, and that this action be REMANDED for further consideration in accordance with the directives set out herein.

This, the 19h day of August, 2025.

Joi Elizabeth Peake
United States Magistrate Judge

---

[13] Notably, the ALJ also refused the request by Plaintiff's counsel for review by a Medical Expert. (Tr. at 478-79.) As acknowledged by the ALJ, the state medical examiners did not have a significant portion of the medical evidence, including any of the evidence from Dr. Parikh, because it came after their review, and it appears that there are issues regarding the Listings and Plaintiff's subsequent medical records that were never reviewed by a medical expert. See Kee v. Berryhill, No. 1:15CV1039, 2017 WL 788306 at *6 and n.7 (M.D.N.C. Mar. 1, 2017) (remanding where Plaintiff's treating physicians were "the only medical sources to have opined on Plaintiff's condition after her second fusion surgery" and "the ALJ did not obtain the assistance of a medical expert to review the additional records"); Shaw v. Berryhill, No. 1:17CV91, 2018 WL 1322159 at *8 (M.D.N.C. Mar. 14, 2018) (remanding where "[t]he ALJ did not enlist the assistance of a medical expert to review the more recent evidence or provide an opinion regarding the extent of Plaintiff's mental impairments for the later period, and as a result, no medical professional has reviewed the records or provided an opinion for the time period"). This issue can also be addressed further on remand.